No. 17-35998

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

GLORIA MITCHELL,

Plaintiff-Appellant,

v.

WINCO FOODS, LLC,

Defendant-Appellee.

On Appeal from the United States District Court
For the District of Idaho,
Case No. 1:16-cv-00076-BLW
The Honorable B. Lynn Winmill, United States District Judge.

OPENING BRIEF FOR
PLAINTIFF-APPELLANT GLORIA MITCHELL

Eric B. Swartz, ISB #6396
(eric@jonesandswartzlaw.com)
JONES & SWARTZ PLLC
623 W. Hays Street
Boise, ID 83702
Telephone: (208) 489-8989
Facsimile: (208) 489-9888

Steven L. Woodrow
(swoodrow@woodrowpeluso.com)
Patrick H. Peluso
(ppeluso@woodrowpeluso.com)
WOODROW & PELUSO, LLC
3900 East Mexico Avenue
Ste. 300
Denver, Colorado 80210

*Attorneys for Plaintiff-Appellant GLORIA MITCHELL*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF PERTINENT STATUTORY PROVISIONS ............ vii

STATEMENT OF JURISDICTION ........................................................ 1

ISSUES PRESENTED FOR REVIEW .................................................. 2

STANDARD OF REVIEW .................................................................... 3

STATEMENT OF THE CASE .............................................................. 3

STATEMENT OF FACTS .................................................................... 6

SUMMARY OF THE ARGUMENT ..................................................... 13

ARGUMENT ..................................................................................... 15

A.  Contrary to the lower court's Orders, section 1681b(b)(2)(A) of the FCRA grants substantive rights that, when violated, cause concrete informational harms and invasions of privacy sufficient to establish Article III standing ...................................................... 17

    1.  As this Court explained in *Syed*, the lynchpin of the standing analysis focuses on whether the job applicant was provided an opportunity to meaningfully authorize the report. ......... 18

    2.  An employer's failure to provide a "clear and conspicuous" FCRA disclosure similarly invades the informational and privacy rights of applicants and employees. ........................ 21

    3.  The lower court misapplied *Syed* and distinguished its facts on an admittedly incomplete record. ................................... 25

B.  Mitchell alleges more than a bare procedural FCRA violation here—she specifically pleads that Winco's Disclosure and Authorization were unclear and overshadowed by the extraneous

information. ................................................................. 31

1.  Employers that combine the disclosures for consumer
    reports with the disclosures for investigative consumer
    reports run the risk that such additional information will
    overshadow the consumer report disclosure. ...................... 32

2.  Winco's Authorization form is also riddled with extra
    information such that it is unclear to any applicant or
    employee just what they are authorizing. ........................... 39

3.  Winco's unlawful Disclosure and Authorization were
    combined together and provided to Mitchell through Winco's
    online job application. ......................................... 42

C.  To the extent Mitchell was required to plead express allegations
    that she was confused by Winco's Disclosure and Authorization,
    she should have been afforded an opportunity to amend. ........... 45

CONCLUSION ................................................................. 48

STATEMENT OF RELATED CASES ................................................. 49

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS, AND
TYPE STYLE REQUIREMENTS ................................................... 49

PROOF OF SERVICE ......................................................... 50

# TABLE OF AUTHORITIES

## CASES

*Alaska Wildlife Alliance v. Jensen,* 108 F.3d 1065 (9th Cir. 1997) .......... 3

*Anderson v. Wells Fargo Bank, N.A.,*
    266 F. Supp. 3d 1175 (D.S.D. 2017) ...................................... 19

*Case v. Hertz Corp.*, No. 15-CV-02707-BLF, 2016 WL 1169197
    (N.D. Cal. Feb. 26, 2016) ................................................ 29, 35

*Demmings v. KKW Trucking, Inc.*, 2017 WL 1170856
    (D. Or. Mar. 29, 2017) ........................................................ 28

*Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141
    (9th Cir. 2000) .......................................................................... 3

*Fed. Election Com'n v. Akins*, 524 U.S. 11 (1998).................................. 20

*Fulfillment Servs. Inc. v. United Parcel Serv., Inc.*, 528 F.3d 614
    (9th Cir. 2008) ....................................................................... 16

*Groshek v. Time Warner Cable, Inc.,*
    865 F.3d 884 (7th Cir. 2017) ......................................... 20, 21

*In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705 (N.D. Cal. 2011)..... 15

*In re Michaels Stores, Inc., Fair Credit Reporting Act (FCRA) Litig.*,
    2017 WL 354023 (D.N.J. Jan. 24, 2017) .............................. 19

*Hansen v. Dep't of Treasury*, 528 F.3d 597 (9th Cir. 2007) ..................... 3

*Hartmann v. Cal. Dep't of Corr. & Rehab.*,
    707 F.3d 1114 (9th Cir. 2013) .............................................. 46

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)........................... 20

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624
    F.3d 1083 (9th Cir. 2010) ....................................................... 3

*Lugo v. Experian Info. Sols., Inc.*, 2017 WL 3605228
    (N.D. Cal. Aug. 22, 2017) ..................................................... 46

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 112 S. Ct. 2130 (1992) ............ 15

*Meza v. Verizon Commc'ns, Inc.*, 2016 WL 4721475
    (E.D. Cal. Sept. 9, 2016) ..................................................... 19

*Milbourne v. JRK Residential Am., LLC*, 92 F. Supp. 3d 425
    (E.D. Va. 2015) ...................................................................... 35

*Miller v. Quest Diagnostics,* 85 F. Supp. 3d 1058 (W.D. Mo. 2015) ....... 29

*Mix v. Asurion Ins. Servs. Inc.*, 2016 WL 7229140
    (D. Ariz. Dec. 14, 2016) ......................................................... 19

*Moody v. Ascenda USA Inc.*, 2016 WL 5900216
    (S.D. Fla. Oct. 5, 2016) ......................................................... 19

*Reyes-Alcaraz v. Ashcroft*, 363 F.3d 937 (9th Cir. 2004) ......................... 3

*Ronyak v. Verde Valley Med. Ctr.,* 308 F. App'x 188 (9th Cir. 2009) ....... 1

*Sargeant v. Dixon*, 130 F.3d 1067 (D.C. Cir. 1997) ................................. 20

*Singleton v. Domino's Pizza, LLC*, 2012 WL 245965
    (D. Md. Jan. 25, 2012) ........................................................... 35

*Speer v. Whole Food Mkt. Grp., Inc.*, 2015 WL 1456981
    (M.D. Fla. Mar. 30, 2015) ..................................................... 16

*Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S.Ct. 1540,
    194 L.Ed.2d 635 (2016) .................................................... 4, 16

*Syed v. M-I, LLC*, 853. F.3d 492 (9th Cir. 2017)............................. *passim*

*Thomas v. FTS USA, LLC*, 193 F.Supp.3d 623 (E.D. Va. 2016) .... *passim*

**STATUTES, RULES, AND OTHER SOURCES**

Fair Credit Reporting Act, 15 U.S.C. 1681 *et seq.* ......................... *passim*

28 U.S.C. § 1291 ...................................................................... 1

28 U.S.C. § 1331 ...................................................................... 1

Class Action Fairness Act, 28 U.S.C. § 1332(d) ....................................... 1

FTC Advisory Opinion to Willner .................................................... 35, 36

H.R. Rep. No. 103–486, 103d Cong., 2d Sess. 30 (1994) ......................... 44

# STATEMENT OF PERTINENT STATUTORY PROVISIONS

## Fair Credit Reporting Act

### 15 U.S.C. § 1681a(d)(1)

(d) Consumer report

(1) In general

The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for--

(A) credit or insurance to be used primarily for personal, family, or household purposes;

(B) employment purposes; or

(C) any other purpose authorized under section 1681b of this title.

(2) Exclusions

Except as provided in paragraph (3), the term "consumer report" does not include--

(A) subject to section 1681s-3 of this title, any--

(i) report containing information solely as to transactions or experiences between the consumer and the person making the report;

(ii) communication of that information among persons related by common ownership or affiliated by corporate control; or

(iii) communication of other information among persons related by common ownership or affiliated by corporate control, if it is clearly and conspicuously disclosed to the consumer that the information may be communicated among such persons and the consumer is given the opportunity, before the time that the information is initially communicated, to direct that such information not be communicated among such persons;

(B) any authorization or approval of a specific extension of credit directly or indirectly by the issuer of a credit card or similar device;

(C) any report in which a person who has been requested by a third party to make a specific extension of credit directly or indirectly to a consumer conveys his or her decision with respect to such request, if the third party advises the consumer of the name and address of the person to whom the request was made, and such person makes the disclosures to the consumer required under section 1681m of this title; or

(D) a communication described in subsection (o) or (x).

(3) Restriction on sharing of medical information

Except for information or any communication of information disclosed as provided in section 1681b(g)(3) of this title, the exclusions in paragraph (2) shall not apply with respect to information disclosed to any person related by common ownership or affiliated by corporate control, if the information is--

(A) medical information;

(B) an individualized list or description based on the payment transactions of the consumer for medical products or services; or

(C) an aggregate list of identified consumers based on payment transactions for medical products or services.

## 15 U.S.C. § 1681a(e)

(e) The term "investigative consumer report" means a consumer report or portion thereof in which information on a consumer's character, general reputation, personal characteristics, or mode of living is obtained through personal interviews with neighbors, friends, or associates of the consumer reported on or with others with whom he is acquainted or who may have knowledge concerning any such items of information. However, such information shall not include specific factual information on a consumer's credit record obtained directly from a creditor of the consumer or from a consumer reporting agency when such information was obtained directly from a creditor of the consumer or from the consumer.

## 15 U.S.C. § 1681b(b)(2)

(2) Disclosure to consumer

(A) In general

Except as provided in subparagraph (B), a person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer, unless--

(i) a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, in a document that consists solely of the disclosure,

ix

that a consumer report may be obtained for employment purposes; and

(ii) the consumer has authorized in writing (which authorization may be made on the document referred to in clause (i)) the procurement of the report by that person.

## 15 U.S.C. § 1681d(a)

(a) Disclosure of fact of preparation

A person may not procure or cause to be prepared an investigative consumer report on any consumer unless--

(1) it is clearly and accurately disclosed to the consumer that an investigative consumer report including information as to his character, general reputation, personal characteristics, and mode of living, whichever are applicable, may be made, and such disclosure (A) is made in a writing mailed, or otherwise delivered, to the consumer, not later than three days after the date on which the report was first requested, and (B) includes a statement informing the consumer of his right to request the additional disclosures provided for under subsection (b) of this section and the written summary of the rights of the consumer prepared pursuant to section 1681g(c) of this title; and

(2) the person certifies or has certified to the consumer reporting agency that--

(A) the person has made the disclosures to the consumer required by paragraph (1); and

(B) the person will comply with subsection (b).

## 15 U.S.C. § 1681g(c)

(c) Summary of rights to obtain and dispute information in consumer reports and to obtain credit scores

    (1) Commission1 summary of rights required

        (A) In general

        The Commission1 shall prepare a model summary of the rights of consumers under this subchapter.

        (B) Content of summary

        The summary of rights prepared under subparagraph (A) shall include a description of--

            (i) the right of a consumer to obtain a copy of a consumer report under subsection (a) from each consumer reporting agency;

            (ii) the frequency and circumstances under which a consumer is entitled to receive a consumer report without charge under section 1681j of this title;

            (iii) the right of a consumer to dispute information in the file of the consumer under section 1681i of this title;

            (iv) the right of a consumer to obtain a credit score from a consumer reporting agency, and a description of how to obtain a credit score;

            (v) the method by which a consumer can contact, and obtain a consumer report from, a consumer reporting agency without charge, as provided in the regulations of the Bureau prescribed under section 211(c) of the Fair and Accurate Credit Transactions Act of 2003; and

(vi) the method by which a consumer can contact, and obtain a consumer report from, a consumer reporting agency described in section 1681a(w) of this title, as provided in the regulations of the Bureau prescribed under section 1681j(a)(1)(C) of this title.

(C) Availability of summary of rights

The Commission1 shall--

(i) actively publicize the availability of the summary of rights prepared under this paragraph;

(ii) conspicuously post on its Internet website the availability of such summary of rights; and

(iii) promptly make such summary of rights available to consumers, on request.

(2) Summary of rights required to be included with agency disclosures

A consumer reporting agency shall provide to a consumer, with each written disclosure by the agency to the consumer under this section--

(A) the summary of rights prepared by the Bureau under paragraph (1);

(B) in the case of a consumer reporting agency described in section 1681a(p) of this title, a toll-free telephone number established by the agency, at which personnel are accessible to consumers during normal business hours;

(C) a list of all Federal agencies responsible for enforcing any provision of this subchapter, and the address and any appropriate phone number of each such agency, in

a form that will assist the consumer in selecting the appropriate agency;

(D) a statement that the consumer may have additional rights under State law, and that the consumer may wish to contact a State or local consumer protection agency or a State attorney general (or the equivalent thereof) to learn of those rights; and

(E) a statement that a consumer reporting agency is not required to remove accurate derogatory information from the file of a consumer, unless the information is outdated under section 1681c of this title or cannot be verified.

# STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal under 28 U.S.C. §
1291, which vests the Courts of Appeals with "jurisdiction of appeals
from all final decisions of the district courts of the United States." 28
U.S.C. § 1291; *Ronyak v. Verde Valley Med. Ctr.,* 308 F. App'x 188, 189
(9th Cir. 2009). On November 13, 2017 the district court denied Plaintiff
Gloria Mitchell's Motion to Reconsider its Memorandum and Decision
granting Defendant's Motion to Dismiss [*Article III Standing*] (R. 45.)
Plaintiff filed her Notice of Appeal with the district court on December
11, 2017. (R. 14.) Plaintiff's Notice of Appeal was timely under Federal
Rule Appellate Procedure 4, which states that the notice of appeal must
be filed within 30 days after the entry of judgment or order appealed
from.

Putting aside Winco's attack on Mitchell's standing under Article
III, which forms the basis for this appeal, the lower court had subject
matter jurisdiction under 28 U.S.C. § 1331, *et seq.* because the case
presents questions under the Fair Credit Reporting Act, 15 U.S.C. §
1681, *et seq.* The lower court also allegedly had subject matter
jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)
("CAFA") because the complaint sought relief on behalf of an alleged

class of at over 100 people, at least one member of the class was from a State other than Idaho (the state of the Defendant), the amount in controversy exceeded $5,000,000 in the aggregate, and none of the exceptions to CAFA applies.

## ISSUES PRESENTED FOR REVIEW

1. Whether the District Court erred in finding that Mitchell lacked Article III standing post-*Spokeo* to bring her FCRA claims where she expressly alleged that Winco's disclosures were unclear and riddled with extraneous information?

This issue was raised by Winco in its Motion to Dismiss [Article III Standing] filed July 18, 2016. (*See* R. 147-151.) The district court ruled on this issue in its Order of March 7, 2017 dismissing the First Amended Complaint. (*See* R. 7.)

2. Did the District Court err in failing to grant Mitchell leave to amend her complaint to expressly allege that she was confused by the disclosures and would not have authorized the background check had Winco's Disclosure been clear and conspicuous and in a document consisting solely of the disclosure, as required?

The district court failed to grant leave to amend in its November 13, 2017 Order denying Plaintiff's Motion to Reconsider. (*See* R. 1.)

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's dismissal for lack of standing. *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1087 (9th Cir. 2010); *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000); *Alaska Wildlife Alliance v. Jensen,* 108 F.3d 1065, 1068 (9th Cir. 1997). The Court accepts all facts in the complaint as true, views them in the light most favorable to the plaintiff-appellant, and draws all reasonable inferences in his favor. *See Hansen v. Dep't of Treasury*, 528 F.3d 597, 599 (9th Cir. 2007). The Court also reviews issues of law *de novo*. *See Reyes-Alcaraz v. Ashcroft*, 363 F.3d 937, 939 (9th Cir. 2004).

## STATEMENT OF THE CASE

This case challenges Defendant-Appellee Winco Foods, LLC's ("Appellee" or "Winco") unclear and confusing background check disclosure ("Disclosure") and accompanying authorization form ("Authorization"). Under the FCRA, employers that wish to obtain background checks on prospective employees must first provide their applicants and employees with a clear and conspicuous disclosure—set forth in a standalone document—notifying them that such a background check may be obtained.

3

Appellant Gloria Mitchell ("Appellant" or "Mitchell") applied to work at a Winco location in Texas, received Winco's form Disclosure and Authorization, and Winco proceeded to obtain a background check on Mitchell. Mitchell, thereafter, worked for several months before she was terminated (based on information in the background check).

But here's the rub: far from providing Mitchell with a clear and conspicuous "standalone" disclosure and authorization, Winco's Disclosure and Authorization was replete with extraneous information that overshadowed and detracted from the consumer report disclosure. That is, Winco's Disclosure and Authorization form included disclosures for "investigative consumer reports," were full of unrelated statements and affirmations of Mitchell's supposed understanding, and were improperly presented as part of Winco's online job application. (R. 209-211.)

Mitchell filed suit under the FCRA and Winco moved to dismiss, first for failure to state a claim under Rule 12(b)(6) and then, subsequently, for a supposed lack of Article III standing in the wake of the Supreme Court's decision in *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540 (2016). (R. 141; 172.) Both motions to dismiss were fully briefed and, on March 7, 2017, the Court issued a Memorandum Decision and Order

4

("Dismissal Order"), granting Winco's Motion to Dismiss [*Article III Standing*]. (R. 7.)

The Dismissal Order found that Mitchell had failed to show concrete injury following *Spokeo*. While Mitchell alleged that the unclear disclosures caused her to suffer "informational harm" and invasions of privacy, the lower court wasn't persuaded and held that additional harm was required:

> Mitchell suggests that failing to provide her with the stand-alone disclosure was a concrete harm because it caused her "informational harm" and "invaded her privacy." *But there is no allegation that Mitchell was harmed in any other way, such as Winco obtaining or distributing false information about her. And she received the very job she applied for at Winco.*

(R. 9.)

In between the time that briefing had closed on Winco's Motion to Dismiss [*Article III Standing*] and the lower court's Dismissal Order, this Court issued its decision in *Syed v. M-I, LLC*, explaining that:

> The disclosure requirement at issue, 15 U.S.C. § 1681b(b)(2)(A)(i), creates a right to information by requiring prospective employers to inform job applicants that they intend to procure their consumer reports as part of the employment application process. The authorization requirement, § 1681b(b)(2)(A)(ii), creates a right to privacy by enabling applicants to withhold permission to obtain the report from the prospective employer, and a concrete injury when applicants are deprived of their ability to meaningfully authorize the credit check.

5

853. F.3d 492, 499-500 (9th Cir. 2017) *cert. denied*, 138 S. Ct. 447, 199 L. Ed. 2d 340 (2017) ("*Syed*"). Mitchell promptly moved for reconsideration of the Dismissal Order on the grounds that her allegations of informational harm and privacy violations were sufficient, as explained in *Syed*, to show concrete injury—allegations of inaccuracy or adverse action were not required. (R. 33.) As was the case with *Syed*, Mitchell had also been denied the ability to make a meaningful authorization.

The lower court again disagreed. On November 13, 2017, the lower court denied Mitchell's motion for reconsideration. (R. 1.) In doing so, the lower court, discounting and attempting to distinguish *Syed*, reiterated its prior finding that Mitchell's challenges to Winco's disclosure and authorization were bare procedural violations and that allegations of additional harm were needed. (*Id.*) No leave to amend was granted, and this appeal timely followed.

## STATEMENT OF FACTS

### Gloria Mitchell completes Winco's online application, and Winco performs an unauthorized background check.

Winco is a privately-held supermarket chain based in Boise, Idaho. (R. 198 ¶ 10.) Winco has over 100 store locations in Idaho,

Arizona, California, Nevada, Oregon, Texas, Utah, and Washington and

operates at least 5 distribution centers throughout the United States.

(R. 198 ¶ 11.) Winco has over 15,000 employees. (R. 198 ¶ 12.)

Plaintiff Mitchell applied for a job in April 2015 with Winco using

Winco's online application. (R. 198 ¶ 13.) During the online application

process, she was presented with an FCRA Disclosure from and an

Authorization form that were combined with extraneous information.

(R. 198 ¶ 15; R. 205 ¶¶ 38, 39.) Mitchell alleges that this extra

information was unlawful, unclear, and "overshadow[ed]" the required

FCRA disclosure. (R. 202 ¶¶ 30-32.)

Shortly after applying, Winco procured a consumer report about

Plaintiff and she was hired as a deli clerk at Winco's Lewisville, Texas

store. (R. 198 ¶ 15.) Plaintiff worked for several months with Winco

before being terminated. (R. 198 ¶ 16.)

***Mitchell files the instant case to vindicate her privacy rights.***

Mitchell thereafter initiated this lawsuit in February 2016

seeking relief under the FCRA. Mitchell detailed the extraneous

information contained in Winco's Disclosure and Authorization (*see, e.g.*,

R. 202 ¶ 32; R. 205 ¶ 40) and specifically alleged that Winco's

Disclosure "willfully violated the FCRA by not being clear and

conspicuous and by including extraneous information such that the disclosure cannot be said to 'stand alone.'" (R. 202 ¶ 32; R. 205 ¶ 37.) Mitchell claimed that the Disclosure and Authorization were unclear in at least 3 ways:

1.    The Disclosure combined disclosures required for "investigative consumer reports" with the disclosures required for consumer reports (R. 202 ¶ 32);

2.    Winco's Authorization was also riddled with extraneous information and should be read together with the Disclosure (R. 205 ¶¶ 38-40); and

3.    Winco's Authorization and Disclosure were improperly combined with the rest of Winco's online job application (*Id.*).

Mitchell further expressly alleged, with respect to the inclusion of all such extraneous information that it "detracts from the disclosure." (R. 205 ¶ 40.)

***Winco moves to dismiss for lack of standing, and the lower court holds that Mitchell's allegations of "informational harm" and invasions of "her privacy" are insufficient.***

Winco appeared in the case through counsel and, after extensions and the filing of Plaintiff's First Amended Complaint, Winco moved to dismiss for failure to state a claim on May 9, 2016 (R. 172.) Mitchell responded in opposition on June 3, 2016. (R. 153.) Thereafter, on July 18, 2016, Winco filed a second motion to dismiss, styled Defendant's

8

Motion to Dismiss [*Article III Standing*] (R. 141) Mitchell filed her

opposition to the attack on her standing on August 25, 2016, (R. 123),

and Winco replied on September 19, 2016. (R. 113.)

On March 7, 2017, the Court issued a Memorandum Decision and

Order ("Dismissal Order"), granting Winco's Motion to Dismiss [Article

III Standing]. (R. 7.) In the Dismissal Order, the Court explained that:

> Mitchell suggests that failing to provide her with the stand-
> alone disclosure was a concrete harm because it caused her
> "informational harm" and "invaded her privacy." But there is
> no allegation that Mitchell was harmed in any other way,
> such as Winco obtaining or distributing false information
> about her. And she received the very job she applied for at
> Winco. (R. 9.)
> ...
>
> [J]ust because a violation of a procedural right can be
> sufficient to create a concrete injury in some circumstances,
> does not mean that it will be sufficient in all circumstances.
> Here, there is no allegation that Winco received or
> disseminated any negative or wrong information about
> Mitchell. And Mitchell received the job she applied for at
> Winco... Based on the allegations of the Amended Complaint,
> this case fits squarely within the "entirely accurate" or "no
> material risk of harm" categories identified by Justice Alito as
> not constituting the type of harm which provides Article III
> standing.

(R. 11-12.) Hence, the lower court concluded that Mitchell's allegations

of "informational harm" and privacy violations were not, without more,

sufficiently concrete. Rather, to hear the lower court tell it, applicants

9

and employees do not suffer such harms absent allegations that inaccurate information was provided about them or that they suffered adverse action.

### *Mitchell moves for reconsideration in light of Syed.*

After briefing on the Motion to Dismiss [*Article III Standing*] had already been completed, this Court issued its decision in *Syed v. M-I, LLC*, 853. F.3d 492 (9th Cir. 2017) *cert. denied*, 138 S. Ct. 447, 199 L. Ed. 2d 340 (2017) ("*Syed*"). On March 10, 2017, just three days following the lower court's Dismissal Order, Mitchell filed a Motion to Reconsider based on Syed's explanation of standing in the context of FCRA background check disclosures. (R. 45.) Mitchell explained that under *Syed*, Mitchell's allegations of "informational harm" and invasions of her right to privacy were sufficiently concrete. (*Id.*) Winco opposed Mitchell's request for reconsideration. (R. 33.)

On November 13, 2017, the lower court denied Mitchell's Motion to Reconsider. (R. 1 ("Reconsideration Order") (collectively, the Dismissal Order and Reconsideration Order are referred to as the "Orders".)) In doing so, the lower court explained that:

> But although *Syed* also addressed the plaintiff's standing in that case, the Ninth Circuit only addressed it in two short paragraphs before moving on to the big question of whether

the disclosure could include a liability waiver. The Ninth Circuit simply gave some general background information on standing, and then concluded that *Syed's* allegation was "sufficient to infer that Syed was deprived of the right to information and the right to privacy guaranteed by Section 1681b(b)(2)(A)(I)–(ii) because it indicates that Syed was not aware that he was signing a waiver authorizing the credit check when he signed it." *Id*. The Ninth Circuit concluded that "[d]rawing all reasonable inferences in favor of the nonmoving party, we can fairly infer that *Syed* was confused by the inclusion of the liability waiver with the disclosure and would not have signed it had it contained a sufficiently clear disclosure, as required in the statute." *Id*. at 499-500. Thus, the Ninth Circuit concluded that Syed had alleged a concrete injury and had standing. *Id*. at 500.

This case does not involve an accusation that a liability form was included with the disclosure. And the inferences and conclusions drawn by the court in *Syed* cannot be drawn in this case based upon the Amended Complaint. The facts in *Syed* are distinguishable from the facts of this case, or at least not developed enough for this Court to make a comparison. The Court cannot make the same inference that Mitchell, like *Syed*, was not aware she signed the waiver, was confused by the inclusion of a liability waiver with the disclosure, and would not have signed it had it contained a sufficiently clear disclosure.

The Ninth Circuit in *Syed* did not create a change in the controlling law on standing set forth in *Spokeo*. The Ninth Circuit did not address Justice Alito's example of a bare procedural violation that does not create Article III standing when a consumer reporting agency fails to provide the required notice to a user of the agency's consumer information, but the information is entirely accurate. *Spokeo* 136 S.Ct. at 1550. Nor did it address his statement that not all inaccuracies cause harm or present any material risk of harm, such as an incorrect zip code in a disclosure. Based on the allegations of the Amended Complaint, this case fits

squarely within the "entirely accurate" or "no material risk of harm" categories identified by Justice Alito as not constituting the type of harm which provides Article III standing. As the Court explained in its earlier opinion, the problem for Mitchell is that consideration of the specific facts of this case, coupled with Justice Alito's conclusions in the last two paragraphs of *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540 (2016), leave her without a concrete injury. Justice Alito plainly stated that a plaintiff cannot satisfy the demands of Article III by alleging a bare procedural violation because "a violation of one of the FCRA's procedural requirements may result in no harm." *Id.* Accordingly, the motion for reconsideration will be denied.

(R. 4-5.) Hence, the lower court found that, notwithstanding *Syed*, Mitchell merely alleged a bare procedural violation. And while the lower court acknowledged that the record wasn't sufficiently developed for it to determine whether *Syed* was truly inapposite, it declined to afford Mitchell any opportunity to amend.

As explained below, this Court should reverse and remand.

## SUMMARY OF THE ARGUMENT

Appellant Mitchell can establish Article III standing. As this Court explained in *Syed*, 853. F.3d at 499-500, section 1681b(b)(2)(A) of the FCRA grants substantive rights that, when violated, cause concrete informational harms and invasions of privacy sufficient to establish Article III standing. The central inquiry, per *Syed*, asks whether the FCRA disclosure and authorization were sufficiently unclear and

12

confusing such that the applicant or employee was deprived of his/her ability to meaningfully authorize the background check.

Applied here, Mitchell alleges that Winco's disclosure was replete with extraneous information that rendered it unclear—to the point where reasonable consumers would be confused as to what they were authorizing. That is, Winco's Disclosure improperly combined disclosures required for "investigative consumer reports" with the disclosures required for consumer reports. Further, the Authorization contains a laundry list of acknowledgements and understandings that are wholly unrelated to, and distract from, the FCRA disclosure such that it is unclear to any applicant or consumer just what they are being asked to authorize. Moreover, the Disclosure and Application were presented as part of Winco's job application—another practice the FCRA prohibits.

The lower court rejected this reasoning. That is, the lower court dismissed Mitchell's case on the grounds that she alleged bare procedural violations of the statute that were unrelated to any actual harm. (R. 9.) Relying on the final two paragraphs of *Spokeo*, the lower court found that Mitchell hadn't alleged any inaccuracies in her information or that adverse action had been improperly taken against

her. The lower court further denied Mitchell's Motion for Reconsideration based on *Syed*, explaining that *Syed* involved a liability waiver and other potentially distinguishable facts (the lower court admitted that the record was not actually sufficiently developed to make this conclusion, but that did not stop it from dismissing the case).

As set forth below, the lower court erred. The rights to information and privacy enshrined in section 1681b(b)(2)(A) are not merely procedural, and applicants and employees need not show that their information was inaccurate or that adverse action was taken against them to demonstrate concrete harm for standing purposes. Rather, the lynchpin of the analysis asks whether the disclosure and authorization allowed the consumer to make a meaningful authorization. Mitchell pleads such a lack of clarity here, and to the extent she was required to expressly claim that she was actually confused by the Disclosure and Authorization and wouldn't have executed the Authorization had a clear disclosure been provided, then she should have been granted leave to amend to include such allegations.

As such, and as set forth below, this Court should find Mitchell has standing to sue and should reverse and remand so that she may finally get her day in court.

# ARGUMENT

Article III standing requires, "as an irreducible minimum, that a plaintiff allege (1) an injury that is (2) 'fairly traceable to the defendant's allegedly unlawful conduct' and that is (3) 'likely to be redressed by the requested relief.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 590, 112 S. Ct. 2130, 2152, 119 L. Ed. 2d 351 (1992) (citing *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)).

This case concerns the first requirement—the need to show an "injury in fact." Injury can "exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing.'" *In re Facebook Privacy Litig.*, 791 F. Supp. 2d 705, 711 (N.D. Cal. 2011) (quoting *Edwards v. First Am. Corp.,* 610 F.3d 514, 517 (9th Cir. 2010)) (citation omitted); *see also Fulfillment Servs. Inc. v. United Parcel Serv., Inc.*, 528 F.3d 614, 618-19 (9th Cir. 2008) (quoting *Warth*, 422 U.S. at 500). At the same time, a "bare procedural violation" of the FCRA, "divorced from any concrete harm," fails to satisfy Article III's injury-in-fact requirement. *Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S.Ct. 1540, 1549, 194 L.Ed.2d 635 (2016).

As set forth below, section 1681b(b)(2)(A) of the FCRA grants substantive rights—including informational and privacy rights—that

cause (or increase the risk of) concrete harms when they are violated. The lower court misapplied this Court's decision in *Syed* by mischaracterizing the rights at issue as being merely procedural in nature and by requiring that Mitchell demonstrate either that the information disclosed about her was inaccurate or that adverse action had been taken against her. Moreover, the lower court attempted to distinguish *Syed* on its facts while conceding that the record was not sufficiently developed to do so.

Ultimately, Mitchell has set forth facts to show that Winco's Disclosure and Authorization were sufficiently unclear so as to increase the likelihood that Mitchell and others would be unclear as to what they were authorizing. This stripped them of their ability, under the FCRA, to make a meaningful authorization, thereby increasing the risk of an unauthorized disclosure.

As such, and as explained further below, Mitchell has standing to pursue her challenges to Winco's Disclosure and Authorization here.

**A.    Contrary to the lower court's Orders, section 1681b(b)(2)(A) of the FCRA grants substantive rights that, when violated, cause concrete informational harms and invasions of privacy sufficient to establish Article III standing.**

Section 1681b(b)(2)(A)'s disclosure and authorization provisions grant substantive rights that, when violated, may cause informational harms and privacy violations that are sufficiently concrete to establish Article III standing. *See Syed*, 853. F.3d 492; *Thomas v. FTS USA, LLC*, 193 F.Supp.3d 623, 628–638 (E.D. Va. 2016).

The lower court seriously misapplied *Syed* and found that Mitchell had alleged a bare procedural violation and that she was required to allege additional injuries—such as the dissemination of inaccurate information or adverse employment action taken by Winco—to show concrete harm. According to the lower court, "this case fits squarely within the 'entirely accurate' or 'no material risk of harm'" categories of injuries identified by Justice Alito writing for *Spokeo's* majority. (R. 12.)

As explained below, the lower court misapplied *Syed*.

1. **As this Court explained in *Syed*, the lynchpin of the standing analysis focuses on whether the job applicant was provided an opportunity to meaningfully authorize the report.**

This Court addressed Article III standing in the context of FCRA background check disclosures in *Syed*. There, an employer provided a job applicant with an FCRA disclosure that contained a statement waiving the employer's liability for having obtained the background

17

check. *Syed*, 853 F.3d 497-98. Syed claimed that the inclusion of the waiver rendered the disclosure incapable of standing alone, but the district court dismissed for lack of standing. In reinstating Syed's case, this Court explained, in pertinent part, that:

> Syed has established Article III standing. A plaintiff who alleges a "bare procedural violation" of the FCRA, "divorced from any concrete harm," fails to satisfy Article III's injury-in-fact requirement. *Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S.Ct. 1540, 1549, 194 L.Ed.2d 635 (2016). However, Syed alleges more than a "bare procedural violation." The disclosure requirement at issue, 15 U.S.C. § 1681b(b)(2)(A)(i), creates a right to information by requiring prospective employers to inform job applicants that they intend to procure their consumer reports as part of the employment application process. The authorization requirement, § 1681b(b)(2)(A)(ii), creates a right to privacy by enabling applicants to withhold permission to obtain the report from the prospective employer, and a concrete injury when applicants are deprived of their ability to meaningfully authorize the credit check. By providing a private cause of action for violations of Section 1681b(b)(2)(A), Congress has recognized the harm such violations cause, thereby articulating a "chain[ ] of causation that will give rise to a case or controversy." *See Spokeo*, 136 S.Ct. at 1549 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 580, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (Kennedy, J., concurring)).

> ...[The allegations] indicate[] that Syed was not aware that he was signing a waiver authorizing the credit check when he signed it. *Drawing all reasonable inferences in favor of the nonmoving party, we can fairly infer that Syed was confused by the inclusion of the liability waiver with the disclosure and would not have signed it had it contained a sufficiently clear disclosure, as required in the statute.* Therefore, Syed did allege a concrete injury and has Article III standing to bring

this lawsuit. *See Thomas v. FTS USA, LLC*, 193 F.Supp.3d 623, 628–638 (E.D. Va. 2016) (holding that an improper disclosure under 15 U.S.C. § 1681b(b)(2)(A) causes "a concrete injury sufficient to confer standing").[1]

*Syed*, 853 F.3d at 499–500 (emphasis added) (internal footnotes omitted.) Hence, per *Syed*, section 1681b(b)(2)(A) confers on applicants and employees certain informational[2] and privacy rights—and, through

_____

[1] In addition to *Thomas*, other district courts in the wake of *Spokeo*, both before and after *Syed*, have concluded that section 1681b(b)(2)(A) confers substantive rights, the violation of which increase the risk of unauthorized disclosure and cause concrete harm. *See Anderson v. Wells Fargo Bank, N.A.*, 266 F. Supp. 3d 1175, 1183 (D.S.D. 2017) (*citing Demmings v. KKW Trucking, Inc.*, No. 14-CV-494, 2017 WL 1170856, at *8 (D. Or. Mar. 29, 2017) ("...[s]ections 1681b(b)(2)(B) and (b)(3)(B) and similar provisions of the FCRA establish substantive informational and privacy rights held by the consumer."); *Mix v. Asurion Ins. Servs. Inc.*, No. CV-14-02357, 2016 WL 7229140, at *6 (D. Ariz. Dec. 14, 2016) ("Violations of FCRA that unfairly deprive a consumer of relevant information, or obtain consent for a background check without a statutorily-proper disclosure, implicate the harms Congress identified in FCRA, and thus cause concrete harms."); *Moody v. Ascenda USA Inc.*, No. 16-CV-60364, 2016 WL 5900216, at *5 (S.D. Fla. Oct. 5, 2016) (holding section 1681b(b)(2)(A) confers substantive rights); *Meza v. Verizon Commc'ns, Inc.*, No. 16-CV-0739, 2016 WL 4721475, at *3 (E.D. Cal. Sept. 9, 2016) (same)); but see *In re Michaels Stores, Inc., Fair Credit Reporting Act (FCRA) Litig.*, No. 2615, 2017 WL 354023, at *11 (D.N.J. Jan. 24, 2017) (finding that "This is precisely the type of "bare procedural violation" that is insufficient to confer standing.")

[2] Courts have long recognized that "a plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *Fed. Election Com'n v. Akins*, 524 U.S. 11, 21 (1998) (*citing Pub. Citizen v. Dep't of Justice*, 491 U.S. 400, 449

the holding of consent, a mechanism to enforce them. The focus of the analysis asks whether the extraneous information renders the disclosure confusing such that the applicant or employee is denied the opportunity to make a meaningful authorization.

The Seventh Circuit similarly addressed standing in the context of FCRA disclosure in *Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884, 889 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 740 (2018). In concluding that an employee had failed to show concrete harm, *Groshek* explained that the complaint in that case:

> contained no allegation that any of the additional information caused him to not understand the consent he was giving; no allegation that he would not have provided consent but for the extraneous information on the form; no allegation that additional information caused him to be confused; and, no allegation that he was unaware that a consumer report would be procured. Instead, he simply alleged that Appellees' disclosure form contained extraneous information. We conclude that Groshek has alleged a statutory violation completely removed from any concrete harm or appreciable risk of harm.

---

(1989)) (failure to disclose information pursuant to Federal Advisory Committee Act "constitutes sufficiently distinct injury to provide standing to sue"); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374 (1982) (injury in fact established where information required under the Fair Housing Act was withheld); *Sargeant v. Dixon*, 130 F.3d 1067, 1070 (D.C. Cir. 1997) ("The receipt of information is a tangible benefit the denial of which constitutes an injury. . . .").

*Groshek*, 865 F.3d at 887. Hence, similar to *Syed*, the key question in *Groshek* boiled down to whether the applicant or employee was plausibly confused by the allegedly extraneous information.

This makes perfect sense—Congress determined that job applicants and employees are entitled to specific information before they authorize a background check for employment purposes. Where consumers are deprived of such information in the way Congress required they face an increased risk of confusion and of being denied the opportunity to meaningfully authorize the background check. Hence, under *Syed*, an applicant or employee may have standing where they can allege they were confused.

As explained next, section 1681b(b)(2)(A)'s mandate that the disclosure be "clear and conspicuous" works in tandem with the standalone requirement and serves a nearly identical function.

**2. An employer's failure to provide a "clear and conspicuous" FCRA disclosure similarly invades the informational and privacy rights of applicants and employees.**

Prior to analyzing the lower court's treatment of *Syed* it is worth noting that in addition to alleging that Winco's disclosure violates Section 1681b(b)(2)(A)'s standalone disclosure requirement, Mitchell

also expressly alleged that Winco violated 1681b(b)(2)(A)'s mandate that the disclosure be "clear and conspicuous." (R. 202 ¶ 30.) *Syed* did not address the "clear and conspicuous" disclosure requirement because the issue was not before it. 853 F.3d at 503 ("...the question of whether a disclosure is 'clear and conspicuous' within the meaning of Section 1681b(b)(2)(A)(i) is separate from the question of whether a document consists 'solely' of a disclosure, and is not one that is before us here...").

That said, when discussing the merits of Syed's claims the Court also explained that:

> Congress passed Section 1681b(b)(2)(A) in order to protect consumers from "improper invasion[s] of privacy," S. Rep. No. 104-185 at 35 (1995), and the disclosure and authorization requirements fit hand in glove to achieve that purpose. Indeed, each would be largely ineffective on its own. Had the statute required disclosure without conditioning the procurement of a consumer report on the job applicant's authorization, it would have failed to give the applicant control over the procurement of the personal information contained in the consumer report. On the other hand, had the statute conditioned the procurement of a report on the job applicant's authorization *without mandating clear disclosure by the prospective employer, Congress's purpose would have been frustrated because applicants would not understand what they were authorizing*. The disclosure and authorization clauses therefore work in tandem to further the congressional purpose of protecting consumers from "improper invasion[s] of privacy." *See id.*

*Syed,* 853 F.3d at 501 (Emphasis added). Section 1681b(b)(2)(A)(i)'s "clear and conspicuous" requirement thus enhances the standalone nature of the disclosure—if a disclosure "stands alone" but fails to be clear and conspicuous, then it still fails to advance Congress's purpose, as recognized in *Syed*, of ensuring that "applicants understand what they are authorizing." *Id.*

As such, the same principles that guided *Syed's* understanding of the purpose of the standalone disclosure and authorization provisions—namely, to ensure that applicants and employees have an opportunity to meaningfully authorize the background checks—apply with equal force to Section 1681b(b)(2)(A)'s "clear and conspicuous" disclosure requirement. Just like the standalone disclosure rule, the "clear and conspicuous" requirement ensures that applicants and employees are given a fair opportunity to understand the disclosure so they can make an informed decision as to whether they want to authorize the reports. If the disclosure is unclear or inconspicuous, an applicant or employee might be misled or confused as to what s/he is actually being asked to authorize.

*Thomas*, which *Syed* cited approvingly, remains instructive. 193 F.Supp.3d at 631-32. In that case, the court explained that:

[Section 1681b(b)(2)(A)] protects against securing a consumer's private information that by way of a consumer report except on certain conditions. ***The first condition is that a person seeking to obtain a consumer report for employment purposes must, before doing so, provide the consumer with a clear and conspicuous disclosure that the report will be obtained.*** The second is that the person seeking to obtain the report must first obtain the consumer's written consent. *Thus, § 1681b(b)(2) establishes two rights. First, it establishes a right to specific information in the form of a clear and conspicuous disclosure. The statutory requirement that the disclosure be made in "a document that consists solely of the disclosure" helps to implement the textual command that the disclosure be clear and conspicuous.* Second, § 1681b(b)(2) establishes a right to privacy in one's consumer report that employers may invade only under stringently defined circumstances. *Those protections are clearly substantive, and neither technical nor procedural.*

*Id.* (Emphasis added). As such, the clear and conspicuous disclosure requirement buttresses the standalone requirement to ensure that applicants and employees can make meaningful authorizations. These are substantive, as opposed to merely procedural, requirements.

In short, the FCRA's "clear and conspicuous" requirement, like and the "standalone" disclosure rule, confers informational and privacy rights that are sufficient, when violated, to demonstrate concrete harm.

### 3. The lower court misapplied *Syed* and distinguished its facts on an admittedly incomplete record.

Prior to *Syed*, the lower court, in its Dismissal Order, explained that Mitchell was required to allege some additional type of harm such

24

as the disclosure of inaccurate information or allegations that she didn't

get the job. That is, the lower court stated that:

> Mitchell suggests that failing to provide her with the stand-alone disclosure was a concrete harm because it caused her "informational harm" and "invaded her privacy." *But there is no allegation that Mitchell was harmed in any other way, such as Winco obtaining or distributing false information about her. And she received the very job she applied for at Winco.* (R. 9.)
>
> ...
>
> *[J]ust because a violation of a procedural right can be sufficient to create a concrete injury in some circumstances, does not mean that it will be sufficient in all circumstances. Here, there is no allegation that Winco received or disseminated any negative or wrong information about Mitchell. And Mitchell received the job she applied for at Winco...* Based on the allegations of the Amended Complaint, this case fits squarely within the "entirely accurate" or "no material risk of harm" categories identified by Justice Alito as not constituting the type of harm which provides Article III standing.

(R. 11-12) (Emphasis added). The lower court plainly found that

Mitchell had alleged mere procedural rights and that any informational

injuries or invasion of her privacy rights failed to qualify as concrete

harm for the purposes of establishing injury-in-fact.

Given *Syed's* explanation it is "a concrete injury when applicants

are deprived of their ability to meaningfully authorize the credit check,"

Mitchell moved for reconsideration. (R. 45.) This was to no avail. That

is, in its Reconsideration Order, the lower court discounted *Syed's*

standing analysis as consisting of "two short paragraphs" and took issue

with *Syed's* reasoning, stating:

> The Ninth Circuit did not address Justice Alito's example of a bare procedural violation that does not create Article III standing when a consumer reporting agency fails to provide the required notice to a user of the agency's consumer information, but the information is entirely accurate. *Spokeo* 136 S.Ct. at 1550. Nor did it address his statement that not all inaccuracies cause harm or present any material risk of harm, such as an incorrect zip code in a disclosure.
>
> ...
>
> Based on the allegations of the Amended Complaint, this case fits squarely within the "entirely accurate" or "no material risk of harm" categories identified by Justice Alito as not constituting the type of harm which provides Article III standing. As the Court explained in its earlier opinion, the problem for Mitchell is that consideration of the specific facts of this case, coupled with Justice Alito's conclusions in the last two paragraphs of *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540 (2016), leave her without a concrete injury.

(R. 4-5.) As such, the lower court doubled-down on its prior decision and

reiterated that Mitchell's allegations of extraneous information leading

to informational harm and privacy violations were insufficient—they

remained bare procedural rights divorced from any actual harm.

This was error for several reasons. First, by treating the

protections afforded under section 1681b(b)(2) as being merely technical

or procedural and by requiring Mitchell to show inaccuracies in her

information or an adverse action, the lower court overlooked the fact
that Mitchell was denied the right to information required by statute
and that this increased the risk that she would suffer concrete harm—
*i.e.*, that she would be confused and unable to make a meaningful
authorization such that her personal information would be disclosed in
violation of her of her privacy rights. Put simply, the lower court
misunderstood the scope of the substantive rights underpinning section
1681b(b)(2)(A) and mischaracterized such rights as being merely
procedural.

Second, while Congress was admittedly concerned about ensuring
accuracy in consumer reports, nothing in section 1681b(b)(2)(A)
suggests that the statute's informational and privacy protections are
only enforceable when inaccurate information is disclosed. "Congress
did not…condition the protections in the FCRA on the accuracy or
inaccuracy of the information contained in the consumer report."
*Demmings v. KKW Trucking, Inc.*, No. 3:14-CV-494-SI, 2017 WL
1170856, at *9 (D. Or. Mar. 29, 2017); *see also Thomas*, 193 F. Supp. 3d
at 632 (rejecting argument that inaccuracy must be shown and
explaining that, "Congress sought 'to prevent consumers from being
unjustly damaged because of inaccurate or arbitrary information,'" and

"to <u>prevent an undue invasion of the individual's right of privacy</u> in the collection and dissemination of credit information.") (Emphasis in original) (*quoting* S. Rep. No. 517, 91st Cong., 1st Sess. 2 at 1.).

And third, the lower court's distinguishing of *Syed* on the grounds that *Syed* involved the inclusion of a liability waiver and this case involves other extraneous information falls apart. First, the lower court admitted that it lacked sufficient information about the facts of either case to determine whether *Syed* was actually inapposite. (R. 4-5) ("The facts in *Syed* are distinguishable from the facts of this case, *or at least not developed enough for this Court to make a comparison.*") (Emphasis added). And, perhaps more critically, the provisions at issue in this case are similar to the liability waiver in *Syed*. The extraneous information included in Winco's Disclosure and Authorization seek the consumer's blessing for the conduct of the employer and the consumer reporting agency in the compiling and disclosing the report. (R. 209-211.) And in both cases the allegedly extraneous information overshadows the consumer report disclosure and increases the risk that applicants and

employees will be confused and deprived of the chance to make meaningful authorizations.[3]

The lower court erred in distinguishing *Syed* on the basis that, "[t]he Court cannot make the same inference that Mitchell, like *Syed*, was not aware she signed the waiver, was confused by the inclusion of a liability waiver with the disclosure, and would not have signed it had it contained a sufficiently clear disclosure." (R. 4-5.) Again, the lower court admitted that it lacked sufficient facts to make such a comparison. And the lower court's assertion that it could not infer that Mitchell was confused and wouldn't have signed the authorization had proper

---

[3] To be sure, liability waivers are not the only extra provisions that employers improperly cram into their FCRA disclosures. *See, e.g.*, *Case v. Hertz Corp.*, No. 15-CV-02707-BLF, 2016 WL 1169197, at *5 (N.D. Cal. Feb. 26, 2016) ("The Court finds that Case's allegations are sufficient to state a claim. The form includes, among other things, information regarding time frames within which the applicant must challenge the accuracy of his or her consumer report, disclosures regarding the circumstances under which the applicant may receive a copy of the report, an acknowledgement that 'all employment decisions are based on legitimate non-discriminatory reasons,' and a state-specific disclosure unrelated to Case's potential employment in California, together constitute extraneous information in violation of the FCRA stand-alone requirement"); *see also Miller v. Quest Diagnostics,* 85 F. Supp. 3d 1058, 1060 (W.D. Mo. 2015) (holding that the applicable disclosure form did not "stand alone" because it included state-specific information and a statement that the consumer "fully understand[s] that all employment decisions are based on legitimate non-discriminatory reasons").

disclosures been made the failed to view the allegations in a light most favorable to Mitchell. She expressly alleges that the Disclosure and Authorization were unclear and overshadowed--the most reasonable inference is that the lack of clarity confused her. Further, and as explained more fully in Section C, *infra*, Mitchell should have been provided leave to amend to allege confusion expressly if needed.

Finally, the lower court's reliance on Justice Alito's hypotheticals in *Spokeo*'s dicta where "a consumer reporting agency fails to provide the required notice to a user of the agency's consumer information, but the information is entirely accurate," or where the inaccurate information consists of incorrect "zip codes"[4] (R. 4.) is also misplaced. In those examples, no consumer has been deprived in any way of his/her ability to meaningfully authorize the disclosure of their private information.

---

[4] This passage from *Spokeo* is also of limited practical value. As just one example, if a bank were engaged in redlining—a practice of avoiding lending to certain geographic areas—or even if a lender merely made less favorable loans in certain neighborhoods, then a consumer reporting agency's failure to accurately state the zip code could result in substantial harm to borrowers. And in any case, the harm in being denied the ability to make a meaningful authorization implicates privacy concerns irrespective of *Spokeo's* somewhat academic treatment of zip codes.

As such, the lower court erred in holding that allegations of additional injuries—beyond the informational harm and privacy violations suffered by Mitchell—were supposedly required. The question is whether the disclosure was sufficiently unclear and confusing. As explained below, Mitchell pleaded a sufficient lack of clarity here.

As explained next, and bearing these principles in mind, Mitchell sufficiently pleaded standing to pursue her claims here.

**B.  Mitchell alleges more than a bare procedural FCRA violation here—she specifically pleads that Winco's Disclosure and Authorization were unclear and overshadowed by the extraneous information.**

Applying *Syed* to the instant case demonstrates Mitchell's standing to challenge Winco's faulty FCRA Disclosure and Authorization. That is, similar to the liability waiver present in *Syed*, Winco's Disclosure and Authorization are chalk-full of additional, extraneous information that render the documents unclear, inconspicuous, and confusing to the average consumer.

First, the Disclosure itself improperly combines the disclosures required for "investigative consumer reports" with Winco's disclosure that it may obtain non-investigative consumer reports. As the FTC has cautioned for almost two decades, this is improper, and employers that

combine such disclosures run the risk of violating the FCRA. Second, in addition to the Disclosure, the Authorization is also peppered with extraneous information that renders it confusing to consumers as to what they are being asked to authorize. And lastly, the Disclosure and Authorization are improperly included in Winco's job application.

As such, and as set forth more fully below, the Disclosure and Authorization were needlessly confusing and Mitchell has standing to bring her FCRA Section 1681b(b)(2)(A) claims.

### 1. Employers that combine the disclosures for consumer reports with the disclosures for investigative consumer reports run the risk that such additional information will overshadow the consumer report disclosure.

Winco's disclosure violates the FCRA because it includes extensive information about the nature and scope of investigative consumer reports that may be procured so that the supposed "stand alone" disclosure required for consumer reports is overshadowed. This has been improper for 19 years. Under the FCRA, "consumer report", as distinguished from "investigative consumer report" is defined as:

> . . . any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumers' credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or excepted to be used or collected

in whole or in part for the purpose of serving as a factor establishing the consumer's eligibility for . . .

(B) employment purposes . . . .

15 U.S.C. § 1681a(d)(1). An "investigative consumer report," on the other hand, is far more detailed. It is defined as:

a consumer report or portion thereof in which information on a consumer's character, general reputation, personal characteristics, or mode of living *is obtained through personal interviews with neighbors, friends, or associates of the consumer reported on or with others with whom he is acquainted or who may have knowledge concerning any such items of information*.

*See* 15 U.S.C. § 1681a(e) (emphasis added). The central difference between the two types of reports is thus the performance of interviews with friends, references, and others.

"Consumer reports" and "investigative consumer reports" are also subject to separate disclosure requirements. That is, a person may not "procure or cause to be prepared an investigative consumer report on any consumer unless:

(1) it is clearly and accurately disclosed to the consumer that an investigative consumer report including information as to his character, general reputation, personal characteristics, and mode of living, whichever are applicable, may be made, and such disclosure (A) is made in a writing mailed, or otherwise delivered, to the consumer, not later than three days after the date on which the report was first requested, and (B) includes a statement informing the consumer of his

33

right to request the additional disclosures provided for under subsection (b) of this section and the written summary of the rights of the consumer prepared pursuant to section 1681g(c) of this title; and

(2)      the person certifies      or      has      certified      to the consumer reporting agency that—

    (A)   the person has    made    the    disclosures    to the consumer required by paragraph (1); and
    (B)   the person will comply with subsection (b).

15 U.S.C. § 1681d(a). Hence, for investigative consumer reports, the disclosure must include statements informing consumers of their ability to obtain additional information regarding the nature and scope of the reports together with a written summary of consumer rights prepared under section 1681g(c).

This contrasts with the requirements for disclosures regarding non-investigative consumer reports, which require only that:

a person may not procure a consumer report, or cause a consumer report to be procured, for employment purposes with respect to any consumer, unless—a clear and conspicuous disclosure has been made in writing to the consumer at any time before the report is procured or caused to be procured, **in a document that consists solely of the disclosure**, that a consumer report may be obtained for employment purposes.

*See* 15 U.S.C. § 1681b(b)(2)(A)(i) (emphasis added.).

The FTC has provided clarification and guidance on the interplay of these separate disclosures rules.[5] Specifically, the FTC's March 25, 1999 "Advisory Opinion to Willner" ("Willner Advisory Opinion") explained that:

> [W]e [previously] opined that the employer could also include the authorization required by Section [1681b(b)(2)(A)(ii)] because the authorization would contain limited verbiage and would enhance the Section [1681b(b)(2)(A)(i)] disclosure, rather than detract from it. We believe that a limited Section [1681d(a)] disclosure would also be permissible, on the same theory. For example:
>
>> A consumer report may be obtained on you for employment purposes. It may be an "investigative consumer report" that includes information as to your character, general reputation, personal characteristics and mode of living. You have a right to request disclosure of the nature and scope of the

---

[5] While non-binding, courts look to FTC Opinions when interpreting the FCRA. *See, e.g.*, *Case v. Hertz Corp.*, No. 15-CV-02707-BLF, 2016 WL 1169197, at *3, 4 (N.D. Cal. Feb. 26, 2016) (relying on FTC Advisory Opinions to Coffee, Leathers, Hauxwell, and Steer); *Singleton v. Domino's Pizza, LLC*, No. CIV.A. DKC 11-1823, 2012 WL 245965, at *9 (D. Md. Jan. 25, 2012) (relying on FTC Opinions and stating that "while the *Safeco* Court concluded that FTC advisory opinions did not constitute *"authoritative* guidance" on the FCRA . . . numerous courts interpreting the FCRA after *Safeco* have found such opinion letters *persuasive." (emphasis in original) (citations omitted); Milbourne v. JRK Residential Am., LLC*, 92 F. Supp. 3d 425, 431 (E.D. Va. 2015) (relying on FTC Advisory Opinions and approving of *Singleton's* reasoning, stating "[t]he approach taken in *Singleton* is a sound and reasonable one because it abides by the rule of *Safeco* while considering the views of the FTC staff to be informative, but not to be entitled to the deference that is owed to a formal Commission Opinion.").

> report, which involves personal interviews with sources such as your neighbors, friends, or associates.
>
> The first sentence (the general consumer report disclosure for employers) sets forth the disclosure without elaboration, and the second and third sentences (the initial investigative consumer report disclosure) are sufficiently brief and in accord with the first sentence that we would consider it as emphasizing the Section [1681b(b)(2)(A)(i)] disclosure, and thus be permissible under that section on the theory set forth in the Steer letter. **However, a Section [1681d(b)] notice setting forth the nature and scope of the investigation would of necessity be much more detailed and would likely be held to overshadow [the 1681b(b)] disclosure in violation of [1681b(b)(2)(A)(i)]. Therefore, we believe that an employer may combine only a very limited Section [1681d] notice with the general Section [1681b(b)(2)(A)(i)] notice without running afoul of the latter section's requirement that the required disclosure be in a stand-alone document. The surest way for an employer to comply, of course, would be to provide the Section [1681b(b)(2)(A)(i)] notice and the Section [1681d] notice in separate documents.**[6]

As such, the disclosure for investigative consumer reports may be combined with the disclosure for non-investigative consumer reports so long as it is limited and doesn't detail the nature and scope of investigation such that it overshadows the consumer report disclosure.

---

[6] *See* Willner Advisory Opinion, *available at* https://www.ftc.gov/policy/advisory-opinions/advisory-opinion-willner-03-25-99 (last visited June 1, 2016) (Emphasis added).

Ignoring the FTC entirely, Winco's form Disclosure includes specific information detailing the nature and scope of investigation to be performed such that the disclosure mandated by 15 U.S.C. § 1681b(b)(2)(i) is confusing. Winco's Disclosure states, in relevant part:

> The report may contain information bearing on your character, general reputation, personal characteristics, mode of living and/or credit standing. The information that may be included in your report include: *social security number trace, authorization to work checks, criminal records checks, civil record checks, financial information and credit checks (Experian U.S. Credit), federal record checks, public court records checks, driving records checks, drug tests, physical tests, education records checks, employment history verification, reference checks, sanction, licensing, and certification checks.* The information contained in the report will be obtained from private and/or public record sources, including sources identified by you in your job application or through interviews or correspondence with your past or present coworkers, neighbors, friends, associates, current or former employers, educational institutions or other acquaintances. You have the right, upon written request made within a reasonable time after receipt of this notice, to request disclosure of the nature and scope of any investigative consumer report from the Company.

(*See* R. 209-211) (Emphasis in original). At 158 words, this passage well-exceeds the limited, 61-word disclosure deemed acceptable by the FTC in the Advisory Opinion to Willner. Indeed, this language combines the language that describes any consumer report that TalentWise, Inc. may obtain for Winco with a description of the nature of scope of any

37

investigation that may be done, specifying that it may include "reference checks" and "interviews or correspondence with your past or present coworkers, neighbors, friends, associates, current or former employers, educational institutions or other acquaintances."

Including extraneous information regarding the nature and scope of an investigative consumer report threatens to overwhelm and detract from the consumer report disclosure, which by statute must standalone. Winco's inclusion of such additional language increases the risk that applicants and employees will be confused and unable to meaningfully authorize the reports. That is, any consumers who received the Disclosure, like Mitchell did, are left to question what personal information a consumer report obtained from TalentWise might include (*i.e.*, can the consumer report include "reference checks" and can Winco obtain a consumer report that includes interviews with friends and neighbors? Or do these disclosures only apply to investigative consumer reports?)

Given the combined disclosures, the Court can fairly infer that applicants like Mitchell are deprived of their ability to meaningfully authorize the background checks that Winco obtained.

**2.      Winco's Authorization form is also riddled with extra information such that it is unclear to any applicant or employee just what they are authorizing.**

Like its troubled Disclosure, Winco's Authorization form is also

replete with extraneous information, including statements:

- verifying that the applicant/employee has "carefully read and understand the separate background check disclosure document and the below authorization form";

- acknowledging that the applicant/employee has received a copy of the "Summary of Your Rights Under the Fair Credit Report Act" even though no such summary is actually provided;

- consenting to the preparation of background reports by TalentWise—a company with whom applicants/employees have had no prior interaction at all;

- confirming the applicant's/employee's understanding that any information provided may be used "for the purpose of obtaining consumer reports and/or investigative consumer reports";

- agreeing that "nothing herein shall be construed as an offer of employment or a contract for services":

- authorizing "law enforcement agencies, learning institutions ...information service bureaus, credit bureaus, record/data repositories, courts (federal/state/local), motor vehicle agencies...past or present employers, the military, and other individuals or sources to furnish any and all information... required by the consumer reporting agency"; and

- certifying that all information provided is true, accurate, and complete and that copies of the form or authorization are acceptable.

(See R. 210.)

This information leaves applicants and employees without the ability to meaningfully authorize the reports. Again, as *Syed* explains, "[h]ad the statute required disclosure without conditioning the procurement of a consumer report on the job applicant's authorization, it would have failed to give the applicant control over the procurement of the personal information contained in the consumer report." 853 F.3d at 501. Yet Mitchell and others had no control over the procurement of their reports—they were called upon to not only authorize such reports, but to acknowledge receiving documents they were never actually provided, to agree to the use of TalentWise (and to bless TalentWise's data collection methods, whether they be legal or not), and to certify that the information they've provided is true etc. In short, applicants/ employees are forced to authorize an entire list of requirements in addition to supposedly authorizing the obtaining of the background check.

To the extent Winco argues that the FCRA requires only that its Disclosure must standalone and that the Authorization can be combined with additional information that distracts from the

Disclosure, such logic should be rejected. Admittedly, section 1681b(b)(2)(A)(i) indicates that the disclosure needs to be made in a document that "consists solely of the disclosure," while section 1681b(b)(2)(A)(ii), which speaks to the authorization, does not say that the authorization must standalone. Rather, the statute indicates that the authorization *may* be included with the disclosure without running afoul of Section 1681b(b)(2)(A)(i)'s requirement that the disclosure document consist "solely of the disclosure", but nothing suggests that the authorization *must* be included in the disclosure itself.

Having said that, and assuming for the moment that the Disclosure and Authorization may be read and treated separate from each other, there is nothing in FCRA or in any other authority to suggest that that an employer's authorization, if supposedly presented on its own page, may be saddled with such extraneous information so as to render it unclear to applicants or employees what they were being called upon to authorize. Indeed, if it is true that the "authorization requirement in section 1681b(b)(2)(A)(ii), creates a right to privacy by enabling applicants to withhold permission to obtain the report from the prospective employer, and a concrete injury when applicants are deprived of their ability to meaningfully authorize the credit check,"

41

*Syed,* 853 F.3d at 499, then it makes little sense to allow prospective employers to shift the extraneous information from the disclosure and into a separate (in name-only) authorization.

Permitting employers to make an end run around the standalone disclosure requirement by loading up the authorization defeats the purpose of ensuring that applicants and employees have the ability to control the disclosure of their personal information and to make a meaningful authorization.

As explained next, there is a particularly good reason to treat the Disclosure and Authorization as together here as both were presented together through Winco's online job application.

### 3. Winco's unlawful Disclosure and Authorization were combined together and provided to Mitchell through Winco's online job application.

Third and finally, the Complaint pleads facts to show that the Disclosure and Authorization were unclear and confusing (and failed to "stand alone") because they were presented together as part of Winco's job application. This was improper. In addition to other changes, Congress added § 1681b(b)(2) to the FCRA in 1994. At the time, the House Committee stated that the provision:

> ...prohibit[s] a person from procuring a consumer report on a consumer for employment purposes unless it has been clearly and conspicuously disclosed to the consumer that the report may be obtained for such purposes and the consumer affirmatively consents, in writing, to the procurement of the consumer report. The disclosure must be made in writing in a document that consists solely of the disclosure. ***Consequently, an employer could not make the disclosure in either a job application or an employee manual*....**

*Thomas*, 193 F. Supp. 3d at 633 (Emphasis added) (*quoting* H.R. Rep. No. 103–486, 103d Cong., 2d Sess. 30 (1994)); *see also Speer v. Whole Food Mkt. Grp., Inc.*, No. 8:14-CV-3035-T-26TBM, 2015 WL 1456981, at *3 (M.D. Fla. Mar. 30, 2015) (holding that "Based on the allegations, with all inferences drawn in favor of Plaintiff, if both the disclosure and the consent forms combined and read as one document with the waiver and release included simultaneously with the disclosure, the complaint states a claim for relief.").

Applied here, Mitchell expressly alleges that:

> 38. Moreover, Defendant's disclosure also violates the FCRA because Defendant, on information and belief, presents its disclosure form and its authorization form (*see* Ex. A) during the same application process and at approximately the same time, such that the forms must be read simultaneously. *See Speer v. Whole Food Mkt. Grp., Inc.*, No. 8:14-CV-3035-T-26TBM, 2015 WL 1456981, at *3 (M.D. Fla. Mar. 30, 2015).

> 39. Because Defendant's disclosure and authorization forms should be viewed as one document, and because the combined

43

> form plainly contains extraneous information, WinCo is in
> violation of the FCRA in this respect as well.

(R. 205 ¶¶ 38-39.) Mitchell further pleads that Winco's Disclosure and

Authorization were presented together, simultaneously, during the

online job application process (R. 198 ¶ 13.) Again, the purpose of the

standalone and clear and conspicuous disclosure requirements is to

ensure that applicants and employees understand what they are

authorizing. When Congress indicated the document must consist

"solely of the disclosure," it intended to bar employers from including

FCRA disclosures in job applications or employee manuals. H.R. Rep.

No. 103–486, 103d Cong., 2d Sess. 30 (1994). Hence, drawing all

allegations and reasonable inferences in favor of Mitchell, the

Disclosure and Authorization should be read jointly as having been

improperly included together in Winco's job application—compounding

the already unclear and confusing nature and scope of the Disclosure.

In sum, Mitchell pleads sufficient facts to show that Winco's

FCRA disclosure improperly and confusingly combined the disclosures

for "investigative consumer reports" with the disclosures for consumer

reports, that its Authorization is replete with extraneous information,

and that in reality Winco provided these ostensibly separate documents

together during its online application such that it is unclear what consumers are being asked to authorize. As such, the Court should reverse the lower court and hold that Mitchell has standing to pursue her claims.

## C. To the extent Mitchell was required to plead express allegations that she was confused by Winco's Disclosure and Authorization, she should have been afforded an opportunity to amend.

In case there remains any doubt as to whether Mitchell has sufficiently pleaded facts from which the Court—viewing all of the allegations in her favor—could infer she was confused by Winco's faulty FCRA Disclosure & Authorization, then Mitchell should be permitted leave to include express allegations regarding her confusion on account of the flawed disclosure.

It is well settled that "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lugo v. Experian Info. Sols., Inc.*, No. 5:16-CV-04647-EJD, 2017 WL 3605228, at *6 (N.D. Cal. Aug. 22, 2017) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) ("[I]n a line of cases stretching back nearly 50 years, we have held that in dismissing for

45

failure to state a claim under Rule 12(b)(6), 'a district court should grant leave to amend even if no request to amend the pleading was made….'")). Indeed, denial is appropriate only "when amendment would be futile." *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1129-30 (9th Cir. 2013).

The District Court failed to provide Mitchell with any opportunity to file an amended pleading setting forth facts to demonstrate her actual confusion. Rather, the lower court explained that:

> [C]onclusions drawn by the court in *Syed* cannot be drawn in this case based upon the Amended Complaint. The facts in *Syed* are distinguishable from the facts of this case, or at least not developed enough for this Court to make a comparison. The Court cannot make the same inference that Mitchell, like *Syed*, was not aware she signed the waiver, was confused by the inclusion of a liability waiver with the disclosure, and would not have signed it had it contained a sufficiently clear disclosure.

(R. 4-5.) This is somewhat confusing. If the lower court believed that the facts were not sufficiently developed, then the proper recourse would have been to order limited discovery or leave to amend so that Mitchell could allege her confusion and unwillingness to authorize the disclosure had it complied with the statute.

And to be sure, if necessary, Mitchell could allege that she was actually confused by Winco's disclosure such that she did not make a

knowing authorization. The Disclosure and Authorization were filled with extra information leaving her to guess as to what she was actually signing electronically. Hence, while such allegations shouldn't be required—the key questions with respect to Mitchell's standing ask whether Winco's violations of 1681b(b)(2)(A)'s standalone and "clear and conspicuous" disclosure requirements deprived Mitchell of information she was entitled to such that her privacy rights were invaded when a disclosure was obtained about her without her knowing authorization— to the extent the Court determines that, post-*Syed*, such allegations of confusion must be explicit, then Mitchell should have been afforded an opportunity to cure by including such facts.[7] The lower court's treatment of Mitchell's injuries as being merely procedural in nature and constituting, at most, bare violations detached from any real harm, left no room for such a remedy.

As such, the lower court's dismissal should not have been with prejudice to Mitchell's ability to re-plead so as to include any additional necessary facts. She suffered actual confusion and can allege as much in

---

[7] The First Amended Complaint—Mitchell's only amended pleading in the case—was filed before *Syed* was decided.

an amended pleading—to the extent such express allegations are indeed required.

## CONCLUSION

The lower court misapplied *Syed*. Winco's Disclosure and Authorization are replete with extraneous information that renders the Disclosure confusing to Mitchell and other applicants and employees. To the extent the record was incomplete or additional allegations were required, Mitchell should have been granted leave to amend.

WHEREFORE, the Plaintiff-Appellant, Gloria Mitchell, respectfully requests that this Honorable Court reverse the decision of the lower court dismissing this case with prejudice and for such additional relief as the Court deems necessary and just.

Dated: March 21, 2018                    Respectfully submitted,


By: /s/ Patrick H. Peluso
Attorneys for Plaintiff-Appellant
Gloria Mitchell

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Plaintiff-Appellant Gloria Mitchell ("Plaintiff" or "Mitchell") herein identifies all "known related case[s] pending in this court."

Mitchell states that, following a diligent inquiry, there are no other related appeals or other cases pending in this Court.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,570 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), as well as the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Century Schoolbook font.

## PROOF OF SERVICE

I am employed in the State of Colorado, County of Denver. I am over the age of 18 and not a party to the within suit; my business address is 3900 E Mexico Avenue, Suite 300, Denver, Colorado 80210.

On March 21, 2018, I served the document described as: **OPENING BRIEF** on the interested parties in this action by sending a true copy thereof to all counsel of record.

[] BY MAIL (ENCLOSED IN A SEALED ENVELOPE): I deposited the envelope(s) for mailing in the ordinary course of business at Denver, Colorado. I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing. Under that practice, sealed envelopes are deposited with the U.S. Postal Service that same day in the ordinary course of business with postage thereon fully prepaid at Denver, Colorado.

[x] BY E-MAIL: I hereby certify that this document was served from Denver, Colorado, by e-mail delivery on all counsel of record at their most recent known email address or e-mail of record in this action.

[ ] BY FAX: I hereby certify that this document was served from Denver, Colorado, by facsimile delivery on the parties listed herein at their most recent fax number of record in this action.

[ ] BY PERSONAL SERVICE: I delivered the document, enclosed in a sealed envelope, by hand to the offices of the addressee(s) named herein.

[ ] BY OVERNIGHT DELIVERY VIA UNITED PARCEL SERVICE: I am "readily familiar" with this firm's practice of collection and processing correspondence for overnight delivery. Under that practice, overnight packages are enclosed in a sealed envelope with a packing slip attached thereto fully prepaid. The packages are delivered by our office to a designated collection site.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this March 21, 2018 at Denver, Colorado.

Patrick H. Peluso                  /s/ Patrick H. Peluso
Type or Print Name                      Signature